DA 07-0372

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 23

IN THE MATTER OF T.S.B.,

Youth in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDJ 07-026-Y (b)
Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Jim Wheelis, Chief Appellate Defender; Joslyn M. Hunt, Assistant
Appellate Defender, Helena, Montana

For Appellee:

Honorable Mike McGrath, Attorney General; C. Mark Fowler,
Assistant Attorney General, Helena Montana

Brant Light, County Attorney; Sarah Corbally, Assistant Attorney
General, Child Protection Unit, Great Falls, Montana

Charlotte Gray, Great Falls, Montana (Guardian ad litem)

Vincent Van Der Hagen, Office of the State Public Defender,
Great Falls, Montana (Mother)

Submitted on Briefs:  November 28, 2007

Decided:   January 29, 2008

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 C.B. II (hereinafter "C.B."), the father of T.S.B., appeals from the order of the District Court for the Eighth Judicial District, Cascade County, terminating his parental rights to T.S.B. We affirm.

¶2 The issues on appeal are as follows:

1. Did the District Court's termination of C.B.'s parental rights to T.S.B., pursuant to §§ 41-3-609(1)(d) and 41-3-423(2)(e), MCA, violate C.B.'s constitutional right to due process?

2. Did the District Court abuse its discretion in terminating C.B.'s parental rights to T.S.B?

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 C.B. and J.B. are the parents of seven children: C.B. III, A.B., C.B. V, T.B., K.J.B., T.S.B., and a stillborn son, C.B. IV. J.B., the mother, suffers from a disorder known as velocardiofacial syndrome (VCFS). VCFS can cause a number of conditions including heart defects, poor muscle tone, cleft palate, a curved esophagus, bowel problems, immune deficiency, and impaired vision and hearing. VCFS can also manifest itself in the form of cognitive problems, including learning difficulties. J.B. is cognitively impaired and of limited intellectual capacity. All of C.B. and J.B.'s children, including T.S.B., were born with VCFS.

¶4 T.S.B. was born on February 21, 2007. On February 24, 2007, the Department of Public Health and Human Services (DPHHS) placed T.S.B. into protective custody with a foster care provider. On February 26, 2007, Deputy Cascade County Attorney Sarah

Corbally, on behalf of the State and DPHHS, filed a Petition for Emergency Protective Services, Determination that Reasonable Efforts are not Required, Termination of Parental Rights, and Permanent Legal Custody with the District Court.

¶5 C.B. and J.B. previously had their parental rights terminated with respect to their five other living children: C.B. III on October 2, 1996; C.B. V and A.B. on January 14, 2000; T.B. on December 4, 2003; and K.J.B. on December 19, 2006. These terminations were grounded in C.B.'s and J.B.'s inability to safely parent. We recently affirmed the termination of C.B.'s and J.B.'s parental rights as to K.J.B. in *In re K.J.B.*, 2007 MT 216, 339 Mont. 28, 168 P.3d 629, and conducted an extensive review of the circumstances that led to that termination, as well as the termination of C.B.'s and J.B.'s parental rights with respect to the other four children.

¶6 The District Court issued an order on February 27, 2007, determining that the State established probable cause to believe that T.S.B. was a youth in need of care, and granting DPHHS emergency protective services of T.S.B. on the ground that letting T.S.B. remain with her parents would be contrary to her welfare, based on the involuntary termination of C.B.'s and J.B.'s parental rights with respect to T.S.B.'s five siblings due to inability to safely parent. The District Court also ordered a show cause hearing, which it eventually set for April 19, 2007. The court reserved, for the show cause hearing, the State's request for a finding that reasonable efforts for reunification of T.S.B. with her parents not be required, as well as the State's request for termination of parental rights and permanent legal custody of T.S.B. The District Court subsequently appointed a guardian ad litem for T.S.B.

3

¶7 C.B. filed a Motion to Dismiss and for Hearing on this Motion, arguing that the State's petition was unconstitutional for violating the Due Process Clause of the Montana and United States Constitutions. C.B. argued that §§ 41-3-609(1)(d) and 41-3-423(2)(e), MCA, violated due process by impermissibly shifting the burden of proof onto the parents.

¶8 The District Court held the show cause hearing on April 19, 2007, but first addressed C.B.'s motion to dismiss. The District Court denied his motion on the ground that §§ 41-3-423(2)(e) and 41-3-609(1)(d), MCA, are constitutional, as the statutes still afforded C.B. and J.B. due process and fundamental fairness by "appointing Counsel, giving them the required notice, an opportunity to be heard, and an opportunity to cross-examine any of the State's witnesses."

¶9 The court then addressed the State's petition, and heard testimony from five witnesses for the State: Sahrita Holum; Lee Smith; Dr. Donna Zook, Ph.D.; Dr. Jennifer Hall, M.D.; and Jana Hayes.

¶10 Sahrita Holum, a DPHHS social worker, testified that DPHHS removed T.S.B. from her parents' custody due to a high risk of physical neglect based upon the five previous terminations. She remarked that she was concerned about how J.B. and C.B. handled the child and stated that J.B. seemed to rely on C.B. for redirection. Holum also explained that her biggest concern was that the parents never once contacted her to check and see how T.S.B. was doing.

¶11 Dr. Donna Zook, a licensed psychologist who evaluated both J.B. and C.B. on several occasions in 2006 after the birth of K.J.B., testified that C.B.'s ability to parent

was "quite inadequate" and that his parenting prognosis was extremely poor. Dr. Zook stated that C.B. "presented both in the interview and on the objective instruments that he is the perfect parent, that he has absolutely no problems in life. He has no personality issues, no problems that create stress or distress in his life . . . ." Dr. Zook also remarked that C.B. tended to "lack emotional expression or emotional connectedness with his child" and exclusively referred to K.J.B. as "my kid." Dr. Zook went on to state that C.B.'s "depiction of his life just totally defies the reality of his situation, not having problems, not having any kind of issue, personal issues that need fixing, treatment, whatever." Dr. Zook concluded that these problems would make it difficult for C.B. to recognize, let alone meet, the developmental needs of a child. Dr. Zook seriously doubted whether C.B.'s problems could be remedied, given past failures with parenting services. Dr. Zook opined that even if C.B.'s parenting problems could be remedied, it would take an extremely long time to accomplish.

¶12     Dr. Zook stated that J.B. "believes that she is without problems, that she is a perfect person, she doesn't have any issues, doesn't have anything disturbing or distressful in her life." Dr. Zook also stated that J.B. tended to defer to C.B. and believed his parenting to be perfect. Dr. Zook further explained that J.B. "also expects the child to satisfy her needs. [C.B.] expects an ideal child, and [J.B.] expects the child to be ideal to [C.B.] . . ." and that "[t]he child is there to support and to gratify [J.B.'s] needs." Dr. Zook believed that this behavior would place a child at risk of abuse and neglect. She ultimately concluded that she did not believe J.B. could benefit from services and be able

5

to safely parent in the reasonable future. She expressed, as to both C.B. and J.B., that it would take a complete rebuilding of their personalities to change their parenting.

¶13 Dr. Jennifer Hall, T.S.B.'s pediatrician, testified that T.S.B. suffered from VCFS, had feeding issues due to poor muscle tone in her throat, and that she had a heart defect. Dr. Hall stated that T.S.B. was at risk for learning problems, language delay, and behavioral problems, and that she will require on-going specialized treatment. Dr. Hall stated that as a result of these conditions, T.S.B. will require a higher level of care and that she will suffer from these problems for her entire life. On cross-examination, Dr. Hall stated that C.B. did seem interested in parenting T.S.B., and that he expected to be allowed to do so. She also stated that C.B. seemed to have affection and love for T.S.B. and wanted to care for her. Nonetheless, Dr. Hall also testified that she was concerned with C.B.'s and J.B.'s ability to feed T.S.B. and that it was uncommon for parents to have that much difficulty with feeding their baby.

¶14 Although these witnesses were crossed-examined, the parents did not call any witnesses of their own. The court also admitted into evidence the previous orders regarding termination of parental rights for C.B. and J.B.'s five other children.

¶15 Based on the evidence and testimony presented, the District Court concluded that DPHHS was not required to make reasonable efforts to reunify T.S.B. with her parents, that clear and convincing evidence showed that C.B. and J.B. were unable to safely and adequately care for T.S.B. within a reasonable amount of time, that clear and convincing evidence showed that continuation of the parent-child legal relationship between T.S.B. and her parents would likely result in ongoing abuse and/or neglect, and that the best

6

interest of T.S.B.'s physical, mental, and emotion condition would be served by terminating the parent-child legal relationship with C.B. and J.B. Accordingly, the District Court terminated the parent-child relationship, and granted permanent legal custody to DPHHS.

¶16 The District Court entered its order on April 26, 2007. The District Court held a permanency plan hearing on May 17, 2007, and, that same day, entered an order approving the permanency plan for T.S.B. This appeal followed.

## STANDARD OF REVIEW

¶17 We review a district court's decision to terminate an individual's parental rights to determine whether the lower court abused its discretion. *In re A.S.*, 2006 MT 281, ¶ 24, 334 Mont. 280, ¶ 24, 146 P.3d 778, ¶ 24. Our review for abuse of discretion is whether the trial court acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice. *In re A.S.*, ¶ 24.

¶18 However, because a parent's right to the care and custody of a child is a fundamental liberty interest, the right must be protected by fundamentally fair procedures. *In re D.B.*, 2007 MT 246, ¶ 17, 339 Mont. 240, ¶ 17, 168 P.3d 691, ¶ 17. Prior to terminating an individual's parental rights, a district court must adequately address each applicable statutory requirement. *In re D.B.*, ¶ 17. "To satisfy the relevant statutory requirements for terminating a parent-child relationship, a district court must make specific factual findings." *In re Custody and Parental Rights of C.J.K.*, 2005 MT 67, ¶ 13, 326 Mont. 289, ¶ 13, 109 P.3d 232, ¶ 13. We review a district court's findings of fact to determine whether the findings are clearly erroneous. *In re L.H.*, 2007 MT 70,

7

¶ 13, 336 Mont. 405, ¶ 13, 154 P.3d 622, ¶ 13. "A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence or if, upon reviewing the record, this Court is left with the definite and firm conviction that the district court made a mistake." *In re L.H.*, ¶ 13. We review a district court's conclusions of law for correctness. *In re L.H.*, ¶ 13.

¶19 "The district court is bound to give primary consideration to the physical, mental and emotional conditions and needs of the children. Consequently, the best interests of the children are of paramount concern in a parental rights termination proceeding and take precedence over the parental rights." *In re C.J.K.*, ¶ 14 (citing § 41-3-609(3), MCA). "Moreover, the party seeking to terminate parental rights must demonstrate by clear and convincing evidence that the statutory requirements for termination have been met." *In re C.J.K.*, ¶ 14.

¶20 Whether a person has been denied his or her right to due process is a question of constitutional law, for which our review is plenary. *In re A.S.*, 2004 MT 62, ¶ 9, 320 Mont. 268, ¶ 9, 87 P.3d 408, ¶ 9. We presume that all statutes are constitutional. *State v. Trull*, 2006 MT 119, ¶ 30, 332 Mont. 233, ¶ 30, 136 P.3d 551, ¶ 30. A party asserting a constitutional challenge to a statute bears the burden of proving, beyond a reasonable doubt, that the statute is unconstitutional, and any doubt is resolved in favor of the statute. *In re M.H.*, 2006 MT 208, ¶ 22, 333 Mont. 286, ¶ 22, 143 P.3d 103, ¶ 22.

## DISCUSSION

¶21 ***Issue One. Did the District Court's termination of C.B.'s parental rights to T.S.B., pursuant to §§ 41-3-609(1)(d) and 41-3-423(2)(e), MCA, violate C.B.'s constitutional right to due process?***

8

¶22    C.B. argues that the application of §§ 41-3-609(1)(d) and 41-3-423(2)(e), MCA, violated his right to due process because: (1) the statutory scheme does not mandate that the District Court hold an adjudication hearing, and (2) the statutes presume unfitness and do not afford C.B. the opportunity to show that his circumstances have changed.

¶23    Sections 41-3-601–612, MCA, provide for the termination of the parent-child relationship. *In re K.J.B.*, ¶ 25. Section 41-3-602, MCA, states:

> This part provides procedures and criteria by which the parent-child legal relationship may be terminated by a court if the relationship is not in the best interest of the child. The termination of the parent-child legal relationship provided for in this part is to be used in those situations when there is a determination that a child is abused or neglected, as defined in 41-3-102.

¶24    Accordingly, to proceed with a termination under §§ 41-3-601—612, MCA, there must first be a determination that the child is "abused or neglected." Section 41-3-102(3), MCA, defines "abused or neglected" as "the state or condition of a child who has suffered child abuse or neglect." Section 41-3-102(7)(a)(i)-(iii), MCA, then defines "child abuse or neglect" as: "(i) actual physical or psychological harm to a child; (ii) substantial risk of physical or psychological harm to a child; or (iii) abandonment." Section 41-3-102(7)(b)(i)(A), MCA, also notes that the term "child abuse or neglect" includes "actual physical or psychological harm to a child or substantial risk of physical or psychological harm to a child by the acts or omissions of a person responsible for the child's welfare . . . ." A "youth in need of care" means "a youth who has been adjudicated or determined, after a hearing, to be or to have been abused, neglected, or abandoned." Section 41-3-102(34), MCA. An involuntary termination under §§ 41-3-609(1)(d) and 41-3-423(2)(e), MCA, does not require that the child be adjudicated as a

9

youth in need of care, only that it be determined the child was abused or neglected. *In re K.J.B.*, ¶ 31.

¶25 In order to terminate the parent-child relationship, the district court must find, by clear and convincing evidence, that any of the criteria enumerated in § 41-3-609(1), MCA, exist. Section 41-3-609(1), MCA; *Matter of M.J.W.*, 1998 MT 142, ¶ 16, 289 Mont. 232, ¶ 16, 961 P.2d 105, ¶ 16. Most relevant to this matter, § 41-3-609(1)(d), MCA, provides that:

> The court may order a termination of the parent-child legal relationship upon a finding established by clear and convincing evidence . . . that any of the following circumstances exist:
> (d) the parent has subjected a child to any of the circumstances listed in 41-3-423(2)(a) through (2)(e) . . . .

¶26 Although DPHHS is generally obligated to make reasonable efforts to prevent removal of a child from the child's home and to reunify separated families under § 41-3-423(1), MCA, there are several key exceptions. Section 41-3-423(2)(e), MCA, states:

> Except in a proceeding subject to the federal Indian Child Welfare Act, the department may, at any time during an abuse and neglect proceeding, make a request for a determination that preservation or reunification services need not be provided. If an indigent parent is not already represented by counsel, the court shall immediately provide for the appointment or assignment of counsel to represent the indigent parent in accordance with the provisions of 41-3-425. A court may make a finding that the department need not make reasonable efforts to provide preservation or reunification services if the court finds that the parent has:
> (e) had parental rights to the child's sibling or other child of the parent involuntarily terminated and the circumstances related to the termination of parental rights are relevant to the parent's ability to adequately care for the child at issue.

¶27 Under § 41-3-607(1), MCA, "[t]he termination of a parent-child legal relationship may be considered only after the filing of a petition pursuant to 41-3-422 alleging the

10

factual grounds for termination pursuant to 41-3-609." Section 41-3-422, MCA, provides that a petitioner may request the termination of the parent-child relationship in the abuse and neglect petition. Section 41-3-422(1)(a)(v), MCA. "A petition for the termination of the parent-child legal relationship may be the initial petition filed in a case if a request for a determination that preservation or reunification services need not be provided is made in the petition." Section 41-3-422(1)(d), MCA.

¶28 With this statutory scheme in mind, we can turn to C.B.'s specific contentions that his right to due process was violated because (1) the statutory scheme does not require that the District Court hold an adjudication hearing, and (2) the statutes presume unfitness and do not afford C.B. the opportunity to show that his circumstances have changed. Each contention can be addressed in turn.

### A. Adjudication Hearing

¶29 C.B. claims that because there was no adjudication hearing, the District Court did not receive any testimony or evidence that T.S.B. was abused or neglected. C.B. acknowledges that the statutes do not require adjudication of the child as a youth in need of care when the State is proceeding with termination based on prior involuntary terminations. However, C.B. asserts that the statutory scheme violated his constitutional right to due process because it is at the adjudication hearing where the District Court "'must determine the nature of the abuse and neglect and establish facts that resulted in state intervention and upon which disposition, case work, court review, and possible termination are based.'" (Quoting § 41-3-437(2), MCA.) C.B. argues that since the District Court must resolve an evidentiary question at the adjudication hearing, he should

11

be entitled to such a hearing and the State should not get to bypass this stage simply because there are prior terminations that are relevant. C.B. claims that by not requiring this evidentiary finding, § 41-3-609(1)(d), MCA, violates his right to due process.

¶30 A parent's right to the care and custody of a child constitutes a fundamental liberty interest that must be protected by fundamentally fair procedures. *In re D.B.*, ¶ 17. Proceedings involving the termination of the parent-child relationship must meet due process requisites guaranteed by the Montana and United States Constitutions. *In re A.N.W.*, 2006 MT 42, ¶ 34, 331 Mont. 208, ¶ 34, 130 P.3d 619, ¶ 34. Fundamental fairness and due process require that a parent not be placed at an unfair disadvantage during the termination proceedings. *In re A.N.W.*, ¶ 34.

¶31 We reject C.B.'s argument that the lack of an adjudication hearing violated his constitutional right to due process. While an adjudication hearing is not required, § 41-3-609(1)(d), MCA, still requires a determination that the child is abused or neglected. *In re K.J.B.*, ¶ 31. Here, DPHHS alleged abuse and neglect in its petition, DPHHS provided an affidavit from social worker Holum detailing the grounds for DPHHS' allegation that T.S.B. was abused or neglected, the District Court heard testimony on the matter from five different witnesses at the hearing, and the District Court issued findings of fact detailing substantial risk of physical or psychological harm to T.S.B.

¶32 Even without an adjudication hearing, the statutory scheme did not deprive C.B. of process. The District Court was still required to determine that T.S.B. was at substantial risk of physical or psychological harm (which constitutes child abuse or neglect under § 41-3-102(7), MCA). In addition, the State also had the burden of showing that C.B.

12

had his parental rights to T.S.B.'s siblings involuntarily terminated and the circumstances related to those involuntary terminations were relevant to C.B.'s ability to adequately care for T.S.B. That C.B. was not placed at an unfair advantage during the termination proceedings is further evidenced by the fact that he received notice of the termination petition, the District Court held a show cause hearing, he was represented by counsel, and he had the opportunity to present evidence and testimony (though he was not required to do so as the burden was on the State).

¶33 C.B. references several cases in which we held that the district court improperly terminated parental rights where the court failed to receive testimony or evidence at an adjudication hearing—*In re B.N.Y.*, 2003 MT 241, 317 Mont. 291, 77 P.3d 189; *In re M.O.*, 2003 MT 4, 314 Mont. 13, 62 P.3d 265; and *In re T.C.*, 2001 MT 264, 307 Mont. 244, 37 P.3d 70. These cases are inapposite to the issue presented here as the terminations all proceeded under § 41-3-609(1)(f), MCA, and can readily be distinguished from the termination of C.B.'s parental rights to T.S.B.

¶34 Under § 41-3-609(1)(f), MCA, a district court may terminate the parent-child relationship when the child is an adjudicated youth in need of care and "(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and (ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time." Section 41-3-609(1)(f), MCA. However, we have held that the parent-child relationship may be terminated *without any adjudication*, under several statutory circumstances, including when parental rights have been terminated as to other children. *In re K.J.B.*, ¶ 37. Under

13

the criteria listed in § 41-3-609(1)(a)–(f), MCA, for termination of parental rights, only one—§ 41-3-609(1)(f)—requires adjudication of the child as a youth in need of care. *In re K.J.B.*, ¶ 31. Subsections 609(1)(a)–(e) do not mandate this requirement. C.B. has failed to demonstrate how a determination that a child is abused or neglected, versus an adjudication that a child is abused or neglected, violates due process.

¶35 C.B. also asserts that the "prior terminations involving C.B.'s other children should not be used to determine what is an evidentiary question solely about T.S.B." We disagree. "[T]he circumstances of a prior termination continue to be relevant in a later termination of a sibling under §§ 41-3-609(1)(d) and 41-3-423(2)(e), MCA, unless the circumstances have changed." *In re Custody and Parental Rights of A.P.*, 2007 MT 297, ¶ 30, 340 Mont. 39, ¶ 30, 172 P.3d 105, ¶ 30. Furthermore, a termination under § 41-3-609(1)(d), MCA, requires a court to take judicial notice of prior terminations and the facts and circumstances surrounding those orders. *See* M. R. Evid. 201, 202. A district court, by necessity, must take judicial notice of prior terminations if it is to determine whether those terminations are relevant to the parents' ability to care for the child currently at issue.

¶36 C.B. has failed to meet his burden of showing that the lack of an adjudication hearing in a § 41-3-609(1)(d), MCA, proceeding is unconstitutional. For the reasons discussed above, C.B. was not placed at an unfair disadvantage during the proceeding as the statutes provide fundamentally fair process. We hold that § 41-3-609(1)(d), MCA, does not violate a person's right to due process for failure to require an adjudication hearing.

## B. Presumption of Unfitness

¶37 C.B. next argues that even if the due process clause does not require that T.S.B. be adjudicated as a youth in need of care, the statutory scheme allowing the District Court to terminate C.B.'s parental rights is still unconstitutional. Although C.B. acknowledges that he was permitted a hearing and received counsel for that hearing, he nonetheless maintains that he had no opportunity to show changed circumstances with respect to T.S.B. because he was not even provided with a treatment plan. Citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208 (1972), C.B. claims that the statutes create a presumption of unfitness that when combined with an inability to counter the State's evidence, violates his constitutional right to due process.

¶38 We recently addressed whether §§ 41-3-609(1)(d) and 41-3-423(2)(e), MCA, create a presumption of unfitness that violates a parent's constitutional right to due process in *In re A.P.* We concluded that the statutory scheme did not violate the parent's right to due process because she received notice of the petition to terminate, the District Court held a hearing on the merits, and she was present and represented by counsel at that hearing. *In re A.P.*, ¶ 22. Furthermore, we specifically rejected the contention that §§ 41-3-609(1)(d) and 41-3-423(2)(e), MCA, created a presumption against her. *In re A.P.*, ¶ 23. We explained that DPHHS retained the burden of showing that the circumstances related to the prior termination of parental rights as to A.P.'s siblings were still relevant to the parent's ability to adequately care for A.P., and that DPHHS was required to establish the statutory elements by clear and convincing evidence. *In re A.P.*, ¶ 23.

15

¶39 Like the parent in *In re A.P.*, C.B. received notice of the petition to terminate, the District Court held a hearing on the petition's merits, and C.B. was present and represented by counsel at the hearing. Although C.B. had the opportunity to rebut the State's allegations and show changed circumstances at the hearing, we note that he chose not to present any witnesses or evidence demonstrating changed circumstances. The statutory scheme did not create a presumption against C.B. as the burden remained on the State.

¶40 We conclude that the statutory scheme provides fundamentally fair process and we reaffirm our holding that §§ 41-3-609(1)(d) and 41-3-423(2)(e), MCA, do not violate a parent's constitutional right to due process.

¶41 ***Issue Two. Did the District Court abuse its discretion in terminating C.B.'s parental rights to T.S.B?***

¶42 C.B. next argues that the District Court abused its discretion in terminating C.B.'s parental rights to T.S.B. because the State failed to demonstrate by clear and convincing evidence that C.B. was unable to parent and/or change within a reasonable time. As this issue is analogous to that addressed by this Court in *In re K.J.B.*, we will use that case as a framework for analyzing this issue.

¶43 The District Court first had to determine T.S.B. was at substantial risk of physical or psychological harm. *See* §§ 41-3-602, 41-3-102(3), 41-3-102(7)(a)(ii), MCA; *In re K.J.B.*, ¶ 29. Once the District Court made this determination, C.B.'s parental rights to T.S.B. could be terminated if it was established by clear and convincing evidence that C.B. had his parental rights to T.S.B.'s siblings or other child of C.B. involuntarily terminated (*In re K.J.B.*, ¶ 29; §§ 41-3-609(1)(d), 41-3-423(2)(e), MCA), and the

16

circumstances related to those involuntary terminations were relevant to C.B.'s ability to adequately care for T.S.B. (*In re K.J.B.*, ¶ 29; §§ 41-3-609(1)(d), 41-3-423(2)(e), MCA). Moreover, the District Court had to give primary consideration to T.S.B.'s physical, mental and emotional conditions and needs, placing T.S.B.'s best interests over C.B.'s parental rights. *In re K.J.B.*, ¶ 29 (citing *In re V.F.A.*, 2005 MT 76, ¶ 8, 326 Mont. 383, ¶ 8, 109 P.3d 749, ¶ 8).

¶44 In its February 26, 2007 petition, DPHHS asserted that it had probable cause to believe that T.S.B. was abused or neglected within the meaning of § 41-3-102, MCA. As grounds for this assertion, the State referenced the previous involuntary terminations of C.B.'s and J.B.'s parental rights to five other children, and attached an affidavit of social worker Sahrita Holum. In her affidavit, Holum discussed the five prior terminations and how they resulted from C.B.'s and J.B.'s difficulties in caring for their special needs children. Holum documented how C.B. had to be constantly prompted to touch or cuddle with one child and that he never adequately grasped how to properly feed the child. Holum further detailed how the parents frequently missed visitations with one child under a previous treatment plan. Holum also discussed how C.B.'s personality and emotional problems would render it difficult for him to adequately parent. Holum described several psychological evaluations that the parents had received, including with Dr. Zook, and the numerous deficiencies that the evaluators noted with respect to their parenting abilities.

¶45 In its April 25, 2007 order, the District Court determined that C.B.'s and J.B.'s parental rights were involuntarily terminated due to their inability to adequately and safely parent on five previous occasions, that the parents would be unable to safely and

adequately care for T.S.B. within a reasonable time, and that continuation of the parent-child relationship between T.S.B. and her parents would likely result in ongoing abuse or neglect. As in *In re K.J.B.*, the District Court here did not abuse its discretion when it determined that T.S.B. was at "substantial risk of physical or psychological harm" by "acts or omissions of a person responsible for the child's welfare." Sections 41-3-102(7)(a)(ii), 41-3-102(7)(b)(i)(A), MCA; *In re K.J.B.*, ¶ 32.

¶46 Having concluded that the District Court did not abuse its discretion when it determined that T.S.B. was at substantial risk of abuse or neglect, we now turn to the other requirements for termination of parental rights under § 41-3-609(1)(d), MCA—(1) that C.B. had his parental rights to T.S.B.'s siblings involuntarily terminated, and (2) that the circumstances related to those involuntary terminations were relevant to C.B.'s ability to adequately care for T.S.B. Given that no party contests that C.B. had his parental rights to five of T.S.B.'s siblings involuntarily terminated, we need only address "whether the District Court correctly concluded that the 'circumstances related to the termination of parental rights are relevant to the parent's ability to adequately care for the child at issue.'" *In re K.J.B.*, ¶ 34 (quoting § 41-3-423(2)(e), MCA).

¶47 C.B. contends that the State failed to show by clear and convincing evidence that he was unable to parent and that he was unable to change within a reasonable time. In support of the contention that he was fit to parent, C.B. notes testimony indicating his affection towards T.S.B., that he helped J.B., and that he asked questions of the hospital staff regarding T.S.B.'s inability to eat. C.B. cites Holum's testimony stating that although J.B. had difficulty holding T.S.B.'s head, C.B. would redirect her, which C.B.

18

asserts was an indication that he did not have difficulties. C.B. also refers to the testimony of Dr. Zook stating that C.B. was not diagnosed with any psychological problems, only that he had personality disorders. The State counters by arguing that DPHHS met its burden of establishing that C.B. remains unable to safely and adequately address T.S.B.'s special needs and provide for her necessary care. The State claims that C.B.'s "circumstances are unchanged from the circumstances surrounding and underlying his previous parental terminations" and that he remains "untreatable."

¶48 We agree that DPHHS met its burden of establishing that C.B. remains unable to safely and adequately address T.S.B.'s special needs and provide for her necessary care. In order to terminate C.B.'s parental rights, the State needed to present the District Court with clear and convincing evidence that the circumstances related to those involuntary terminations were relevant to C.B.'s ability to adequately care for T.S.B. The orders for the five previous terminations of C.B.'s parental rights illustrate the numerous difficulties C.B. had in parenting his children. "We have determined that the circumstances of a prior termination continue to be relevant in a later termination of a sibling under §§ 41-3-609(1)(d) and 41-3-423(2)(e), MCA, unless the circumstances have changed." *In re A.P.*, ¶ 30. Furthermore, the testimony at the hearing supports the determination that the circumstances related to the previous terminations are relevant to C.B.'s ability to adequately care for T.S.B. As noted earlier, Holum expressed concern that C.B. never once contacted her to see how T.S.B. was doing. Dr. Zook evaluated C.B. in early 2006 and testified as to C.B.'s inadequate parenting skills, his personality disorders, his difficulty in meeting the developmental needs of a child, his lack of emotional

19

expression, and his poor prognosis for change. Dr. Hall explained how T.S.B. suffered from the same genetic condition as her five siblings and how she would likewise require a higher level of care. Previous terminations show that C.B. had difficulty with feeding his other children, and Dr. Hall testified that he again had this trouble with T.S.B. and that it was uncommon for parents to have that much difficulty. The District Court's findings of fact referenced this testimony. Based on the foregoing evidence and testimony, we conclude, as we did in *K.J.B.*, that "their circumstances are unchanged from the circumstances surrounding and underlying their previous parental terminations." *In re K.J.B.*, ¶ 36.

¶49 For the foregoing reasons, we conclude that the District Court did not abuse its discretion in terminating C.B.'s parental rights to T.S.B.

## CONCLUSION

¶50 We hold that the termination of C.B.'s parental rights to T.S.B. pursuant to §§ 41-3-609(1)(d) and 41-3-423(2)(e), MCA, did not violate C.B.'s constitutional right to due process. Furthermore, we conclude that the District Court did not abuse its discretion in terminating C.B.'s parental rights to T.S.B. as the State established by clear and convincing evidence that C.B. had his parental rights to T.S.B.'s siblings involuntarily terminated, and that the circumstances related to those involuntary terminations were relevant to C.B.'s ability to adequately care for T.S.B.

¶51 Affirmed.

/S/ W. WILLIAM LEAPHART

20

We concur:

/S/ JIM RICE
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS


Chief Justice Karla M. Gray, specially concurring.


¶52     I specially concur in the Court's opinion, notwithstanding my strong disagreement with it.  I set forth the reasons for that disagreement at some length in my dissent to *In re K.J.B.*, 2007 MT 216, ¶¶ 39-48, 339 Mont. 28, ¶¶ 39-48, 168 P.3d 629, ¶¶ 39-48.  The Court's determinations in *In re K.J.B.* are now the law of the State of Montana, however, and I am obliged—like all Montanans—to follow the law.  I do so most reluctantly.


/S/ KARLA M. GRAY


Justice James C. Nelson joins in the foregoing specially concurring Opinion.


/S/ JAMES C. NELSON